Our next case for argument is Cuviello v. City of Oakland. Good morning. May it please the Court, my name is Whitney Lay and I represent the appellant Denise Bobel. Joseph Cuviello, who is in pro per, is also here and will be arguing. We've spoken and we'd jointly like to reserve a few minutes for rebuttal. This case... You represent who? Which parties do you represent? Denise Bobel, B-O-L, B-O-L. Okay. Yes, okay. This case involves two appeals that were consolidated involving two injunctive orders issued in August of 2010. If you move the microphone up, you won't have to hunch over so much. Thank you. I hate to see bad posture. Thank you. Both of them involved preliminary injunctions that were issued by the district court of the Northern District of California. The first denied the plaintiff's request to modify a preliminary injunction and the second granted the defendant's and intervenee's request to modify the preliminary injunction. And the preliminary injunction involved the rights of animal rights activists to engage in free expression activities that they had been engaged in in and around the Oakland Arena, activities that they had been participating in for several years prior to the issuance of the injunction. As we have explained in our papers, we believe that the court erred in denying the plaintiff's request to modify the injunction and also erred in granting the defendant's and intervener's request. And I think that as to both orders, some of the errors that are clear from the court's decision is a misapplication of the standards by which courts must test government efforts to restrict free expression and a insufficient attention or appreciation for the irreparable harm that's caused when governments impose such restraints. Let's get this straight. You were appealing the refusal of the court to modify the injunction to eliminate the buffer zone. Yes. That's it, right? No, that is not correct. Was there more to it than that? Yes. That occurred, I believe, on August 5th. But eight days later, the court granted an injunction modification. Yes, I understand that. It granted a modification to allow the Ringling Brothers, Barton & Bailey, to build the fence around the truck area and change the walkway from the animal area to the truck area. That's right. What that second order did was to eliminate the walkway that had previously been imposed to allow my clients to videotape animals. But it moved the walkway. Actually, actually. About four parking spots away. That's actually not true. What they asked for was for the court to eliminate the part of the injunction that had been imposed after multiple hearings and evidentiary review, requiring the defendants to permit my clients to have a walkway so that they could videotape and record the treatment of animals by the circus. Can I ask a factual question? That, as I understand it, was on one side of the fence around the animal compound. Is that right? That is my understanding, yes. But you still have access to the other side of the fence around the animal compound. Is that right? No. Because of the way it's structured, I believe the walkway that was eliminated covered the entire area that my client, Ms. Bobel, and Mr. Cuviello had previously used. And it was key with respect to the positioning of the animals for them to have a meaningful means to videotape. So I don't think that Mr. Cuviello, who is here, might be the best person to precisely describe that for you. Now, you said, but you didn't address, you said that the district court erred in its application of the First Amendment rules that apply? Yes. Yes. What is your point? Well, here's what happened. There was a buffer zone imposed by the court for the 2009 circus, creating a 10-foot buffer zone. Originally, the court said that the entrance to the animal house, an area in which my client, Ms. Bobel, had been leafleting peacefully for decades, for a decade, without any incident. There are no prior incidents of problems of congestion at this area. However, the court, after many hearings, determined that there was some speculative possibility, and on that basis created the zone for 2009. Then what happened in 2009 is the defendants, who had requested the buffer zone, immediately allowed Ringling Brothers to put in a table so that someone could engage in free speech activities within this zone, but just not my clients. So essentially what they created was a Ringling-only free speech zone, which not only demonstrated the content-based nature of their concern about congestion, but also that the need for any restriction. Do we know how long that the individual was allowed to be in there? Every day of the circus. Every day. Each day of the circus covered several days. But the district court, in refusing the modification, also told them that she couldn't be there anymore. Well, that's the problem with the court's order, because the original injunction, all it did was restrict the ability of the defendants to impose a free speech restriction. And what the judge did in denying the modification was expand the restriction to preclude even the speech that the defendants wanted to allow. And so she converted an order that merely restricted their ability to prevent my clients from engaging in speech to take the evidence that speech was working, to preclude that speech. And she actually converted the nature of the order. What I understood her to be saying is, look, you can't have it both ways. So you can either let them in the area or you can keep yourself out of the area, but you can't have it both ways. That, I think, is one way of looking at what she was saying. But if you consider the effect of what she was doing, she was saying that in an – when we were dealing with an issue of the restriction on free speech, when the court's scrutiny must be extremely high, we are going to take evidence that free speech is working when expressed by one side, and in order to sort of, in a Solomonic way, split the baby, not get rid of the restriction, but expand it. And there is no basis for converting an order that did not apply to the defendants, did not preclude the defendants from engaging – from allowing free speech, and to turn it into an order that essentially expands a restriction based on evidence that, at best, shows that any restriction is unnecessary. Well, they don't have to – the district court doesn't have to wait for a – or the defendants don't have to wait for a major incident before they can ask for such a restriction, do they? No, no. They certainly don't have to wait for a major incident. But the court has been extremely clear that the sort of speculative reference to potential concerns cannot be a basis for the restriction on free speech because – in part because such invocations can always be made in almost any case. And in this case, you have a record that's not disputed of years and years of free speech without this restriction, without any incident. Over that time period, was the configuration the same? I believe the configuration has been altered in some respects almost every year. But what's been consistent up until the 2009 was that there was not a restriction on the – by clients' ability to communicate with people at the entrance of the It's a fairly de minimis restriction. I mean, I looked at the pictures, the movie, the videos, and you're talking about the distance from here to there, essentially. Well, it's not de minimis if it means that you have a greater access to speak to people by being closer to the entrance. But I'm trying to see why that's even true, because people had to get to the entrance. So they – you just can't talk to them from 10 feet to the entrance to the entrance, but you can talk to them from 10 feet to the entrance all the way back, right? Well, no, because people are moving – you're talking – you may be – assume you're speaking about one person, Ms. Boebel. Her ability to reach more of those people who can be coming in from different sides is different. And the burden shouldn't be on her to establish that the – that the restriction is not impairing her when there's no evidence. But it's teeny. I mean, as you know, I wrote the Cuba case, and in the Cuba case, they were restricting people 250 feet away from the entrance. And, you know, we said, well, you know, that doesn't make any sense at all. There's no justification. Where are the crowds? But if you got really close to the entrance, it could be different. I mean, this is really close to the entrance. I mean, really close. It's from here to there. Your Honor, I think – but I think that what makes this case different is that Ms. Boebel did not immediately, when the restriction was imposed, run to the appellate court and seek its reversal. They sought the modification after the defendants placed a table, not an individual, a table in the supposed area they needed to restrict and kept it there throughout the circus. And the – Is there any numerical limitation to how many of the protesters can be in whatever area we're talking about? We have, I know in other cases, the restrictions. No, in this case. In this case, I believe the order allowed as to at least my clients and I believe two other individuals, but I'm not certain as to the restriction. But that's something the Court might have considered but did not impose. Do you want to share some time with Mr. Covello? Sure. I'm not sure I pronounced his name correctly, but. Good morning, Your Honors. If it may please the Court, Justice Kaviello in pro se. I just want to. Can I ask my factual question first? Pardon? Can you answer my factual question first? Yes. That is, with regard to the perimeter path, which is now not available because – and actually, your counsel didn't really address the perimeter path question. But it's now, as I understand it, not available because the parking lot that it's in has been closed off. But is other parts of the perimeter of the animal compound still available? The animal compound has a fence around it, and it's four sides. Right. And at three sides, we're absolutely can't even get close to the fence. Now, with this, the block off of the parking lot. And there's a diagram I think was submitted showing that. And on the fourth side, which is over near the highway, towards the highway, the fence is less distance from the compound fence. It's probably, I don't know, maybe 20 feet from the compound fence. Whereas the other sides, it's about 50 to 75 feet away from the compound fence. So I'm not understanding the answer to the question. If the answer to the question is yes, you can still access, get right next to the fence to the compound on the other side. No. We can't get next to the fence on the compound. Because? Because of the fencing that they put up to block the parking lot surrounding the compound. But you said it wasn't surrounding. You just said it's only surrounding it on three sides. It's there. The fourth side, it's about 20 feet. The new fence, it's about 20 feet from the animal compound fence. So it's closer to the animal compound fence. I see. There's still a fence, but it's closer. Yes. I see. Okay. And a couple other things I just wanted to address was the it's not four parking spots away from the original fence. It's much further away. It's about 50 to 75 feet away, which is the question I was just addressing there. And the other one is on the 10 feet, when you suggested it was a minimal restriction, 10 feet may or may not matter depending on the circumstance. And the configuration does change out there quite a bit. But the fact remains, if we were to allow our rights to be unconstitutionally restricted 10 feet now, in the future it could be 20 feet, it could be 30 feet. And the evidence in this case has just shown that there's just absolutely no justification for this 10 feet based on the evidence of record. And that's one of the things we're contesting is the court standard they applied here for this time, place and manner restriction, which everybody agrees it is, was erroneous. And it was based on erroneous facts. What is it that you want to do within that 10 feet entrance, within the 10 feet perimeter to the entrance? We would be leafleting. You want to leaflet? People coming in and coming out, yes. And you're not able to leaflet elsewhere? We are able to leaflet elsewhere, but we would be leafleting there as well. What about with regard to the perimeter fence? I gather the main reason for that access is to take photos. Yes. But my understanding is this whole case began with a different area, about a different area, a walkway or something. Yes. From which you were taking photos. And you still have the injunction allowing you to take photos from there, right? Yes. We were taking photos at many different places around the arena, because the circus quite often they'll put barriers in our way, trailers or something. So we're always looking for a vantage point to see something. But you do have some injunction in place assuring you of the ability to take to access some places from which you can take photos. We have an injunction assuring us the ability to stand at a certain place. It doesn't mean that even though we're standing there, we're going to have a vantage point at that place. We have the ability to stand there. And this is on the north landing. But as I said, they reconfigure every year. And they could just basically put trailers in our way to block the tent from there. So that's why we need different vantage points. And we're just talking about public forehand. I have a procedural question, which maybe you're not in a position to answer. But why are these all preliminary injunctions? I mean, usually you have a preliminary injunction, and then at some point you have a final injunction. And we don't. We just keep having we've never had a trial in this case, as I understand it, or a final or a summary judgment, or an actual injunction. And why and which has procedural implications, because there's enormous deference with regard to preliminary injunctions. So that puts you in a worse position in terms of trying to deal with the to challenge the injunction. Why doesn't anybody finish this case? Why didn't anybody fix it? Finish it. Finish it. Finish the injunction. Finish the trial. You get a permanent judgment, a permanent injunction. Right. We haven't the case has been moving slow, I admit that. And we haven't even we don't even have a case management schedule at this point. We had one. But what happened is we had our injunction and it was set in place in 2007. We felt that the defendants violated our rights. The court acknowledged they may have violated your rights, but it wasn't in an area that was covered by the injunction. So we went back and tried to fix the injunction to cover our rights in the other areas around there. And then in 2008, with that injunction, we were arrested near the entrance to the Animal Open House and we were kept out of the parking lot surrounding the animal compound area while other people were allowed in there. So we would we added we filed another claim, another case complaint, and then the court joined them. And since then we had another contempt motion and the court denied that contempt motion but decided to try and fix the injunction, which was the 2009 injunction, try and be very specific about it, which is what the 2009 was. And then in 2010, of course, we asked to modify it. And so the defendants and that's how we arrived here. All right. I have a couple of questions, factual questions. Also, it seems to me that the new perimeter fence around the parking area truck compound does not extend along the west face nor the south face of the animal compound. Is that correct? The west face, it does come out about 20 feet from the animal compound fence. That was the side I was talking about. The south face, we are not allowed in that area anyway. You're not allowed in that area? No, that area is blocked off to us anyway. The west face? The west face is the one where I was saying it's about 20 feet away from the original compound fence. So the only areas we actually accessed the animal compound fence was the west face, the north face, and the east face. The south face, we were never in that area. Let me ask you one other question. It's my last question. Sure. If you buy a ticket, you can take your video in and film all you want, right? No, they don't allow videos in the show. Oh, in the animal compound? In the compound, typically, sometimes I've seen people. I know when we bought a ticket, all of a sudden the rule changes where there's no video allowed. So not often, you know, when we go in, the rules change. That's what happens. So we've gone in and been told. Is there evidence in that before the district court that when you go in, you're not allowed to video, but other people who buy tickets are allowed to video? Not with respect to the animal compound. That's all I'm talking about, the animal compound. No, not with respect to that area. So can we get this straight? If you do buy a ticket, you can take your video and go in the animal compound and shoot all the video you want? No, that's not my understanding. The video is not allowed in the compound. Nobody's video is allowed in the compound, is your assertion. Yes. Cameras. Still cameras, but not videos. All right. Another last point I want to make is we are contesting the fact that we don't believe that the defendant's desire to place a fence around the parking lot in 2010 was a changed circumstance or changed fact that warranted a modification of the injunction as well. That's briefed. Thank you. Okay. Thank you. We'll hear from the defendant. Good morning, Your Honors. May it please the Court. I just want to introduce at council table, we have Mr. Williams, who represents the city defendants, and Ms. Elzencalli, who represents the intervener, Feld. They are both available if you have specific questions for them, but otherwise I'll be handling the argument for the defendants. What we have in this case Your name is? What? Your name. Oh, I'm sorry. Jeremy Rosen, Horvitz & Levy for the county defendants. What we have here are two very modest time, place, and manner regulations coming up on appeal from a preliminary injunction where, to reverse, this Court would have to find that Judge Patel abused her discretion and made clearly erroneous factual findings, which we believe is not shown for either of the two regulations. Starting with the 10-foot buffer zone, this is sort of a classic, very minor and modest time, place, and manner regulation that, as this Court said in Cuba, common sense dictates that when you get close to the entrance where you have a convergence of people, there are significant crowding concerns, and it might be, therefore, reasonable to have a modest regulation. And, indeed, but... Well, as it turned out, I mean, apparently in 2009 it wasn't too crowded that they couldn't, that they decided it was okay to let in representatives from Ringling Brothers to be able to sell, I guess, what was it? Programs. Programs. Well, a couple of observations on that. As the Bryant declaration in the supplemental excerpts of record filed by Feld points out, the reason that the Ringling employee was in the buffer zone was because she was sort of forced there by haranguing and harassing conduct by the plaintiff. That's not really relevant, is it? It's not. To the point of this, which is, I gather, that at least having one person sitting at a table did not seem to create difficult crowding problems. Correct. But Judge Patel answered that with a specific factual finding, that given the history of friction between the plaintiffs and Ringling personnel, when you have the two of them together within the buffer, that increases the likelihood of the friction causing crowding and prevention of ingress and egress, especially when you have a lot of parents with young kids. Isn't that a heckler's veto sort of an argument, essentially, because the Ringling brothers' people don't get along with the protesters, they can keep them out? Well, I think it's a mutual dislike. I'm not sure it's one side versus the other. But, again, I think that might be a reason not to, as in Cuba, keep people 250 feet away, but when you have, you know, potentially thousands of people coming down the chute, parents with their kids, to allow for ease of ingress and egress into the entrance of the animal compound seems like just a very reasonable. How does this work? The chute is just – I mean, it's called a chute, it's just some of the fences that are cabining and the crowd coming in, right? Right. That everyone who goes into the animal compound has to walk through this rather long chute. Because there must be a spot at the other end of the chute where they start from that they could go to and reach everybody. Yes, and my understanding is that the plaintiffs have, you know, to try to reach – have their message at the beginning of the chute. Throughout the chute, if you watch the video, you'll see them walking through the chute, sort of putting their cameras into people's faces. I mean, they're clearly getting their message across to everyone. So this was portrayed as if there were lots of people coming from different directions and the entry is the only place they all are. But is that not so? That's not – that is not so at all. The record, I think, is very clear that everyone has to go through the chute to get into the animal compound, and the only place within sort of this tunnel that everyone has to go through that plaintiffs and now the Ringling defendants as well are excluded from is this 10-foot apron around the entrance. And as Judge Patel found, and I think the video – especially if you look at the video excerpts in 256, clip one at the 45-second mark, the 59-second mark, a minute 33, and a minute 52, when you have just a few people within that sort of 10-foot apron, it crowds up very fast, very quickly, and creates the condition for a risk of overcrowding, whereas if you interject sort of hostile people within there as well, you have a significant safety concern, and that's why this is sort of a classic reasonable time, place, and manner restriction. And unlike Cuba, where this Court was clear to note that the problem with these sort of three distant places was that there was no guarantee that everyone who was going into the circus would have to go by the three designated areas, here the opposite is true. Everyone who goes into the animal compound has to go through the chute, and therefore the plaintiffs have complete and total access to being able to get whatever message they want to them, distribute their leaflets. Is this the only entrance into the arena? What if somebody didn't want to go into the animal compound? Could you avoid, could they avoid this completely? Well, sure. That's a separate question, and that's not at issue here. I'm just curious. The arena is on the opposite end, and there are sort of stairs that go up to the arena, and the plaintiffs in other parts of the injunction that are not at issue in this appeal have access to the stairs and the landing and other points of entry into the arena. So everybody coming into that chute is headed towards the animal compound? Yes. Or can they make another, can they make a turn and go into the arena? No. If you're going into the chute, you're heading to the animal compound. If you're going into the arena, you would not be in the chute. Right. You would be in a different area. And the plaintiffs have a wide-ranging injunction to other portions of the property that's not at issue on this sort of limited preliminary injunction appeal. What about the other part of it, the perimeter fence? Sure. The perimeter fence, again, as with the barrier, needs to start with the factual findings made by Judge Patel and Judge Chen. And the factual findings made was that this particular part of the parking lot has always been sort of a warehousing area for large circus trucks and trailers. If you look at the video excerpts in the record, especially clip 8 at 11.34, it shows that there are open trailers with ramps to move in supplies and a number of forklifts that are there to take the heavy equipment in and out. The declaration from Mr. Little, which is in the record and which Judge Patel cited, indicates that there's sort of constant movement of equipment in and around that area and that the defendants have very legitimate safety concerns for that if you have members of the public just wandering through this area where you're having heavy equipment loading and unloading things, that's not a safe situation. But in fact, they always did have members of the public. Well. Maybe not they didn't necessarily want them, but they weren't making any real effort to keep them out. Well, that's actually incorrect. As I think Judge Patel found, there had been barriers that had been sort of more porous barriers in the past. And the people, you know, ran the public, some of them were just not complying with those barriers. And so you were having people getting through. And the changed circumstances Judge Patel found was that for the most recent circus, the defendants decided that we really need to secure this situation. We thought we had these barriers, these K-rail barriers up before. They weren't keeping people out. We need to do something more secure. We shouldn't have to wait for, you know, a child to be run over by a forklift before we can actually do something. This has not, you know, this has not been an area that has been meant for the public. And the fact that our previous efforts at keeping the public out had not been successful, which is what in large part animated the earlier ruling in the preliminary injunction allowing for the plaintiffs to have some access to the area, that, you know, we actually now want to be able to secure this area. Again, it's not only a safety concern, it's also a sort of a property concern as well. This is very expensive equipment. Just like any sort of warehouse situation, you just, you don't want random members of the public wandering in and around sort of the heavy equipment and the valuable property. This is not an area that any member of the public is supposed to be in, and therefore. So this is a six-foot high fence, right? That's correct. Temporary fence. Yes, I mean the. Right, it's movable. And it's covered with a mesh, right? That's correct. So if they wanted to take photos, they couldn't take photos through that fence? I believe that's correct. Although the question, though, in terms of what is. So where can, on this diagram that's in the brief on page 10, where can they take their photos of the animal compound? Well, the primary area that they have always insisted is their best photo area is either on the north ramp and north landing. And I would direct the Court's attention to the original excerpt of the record, page 138, which is from the original 2007 order from Judge Patel and Judge Chen, where it indicates the factual finding that the north ramp landing is the best vantage point for plaintiffs to videotape the animals because of its location looking directly down into the animal compound. Now, does that finding still hold with the six-foot fence? Because I gather when she made that finding previously, that wasn't, that six-foot fence wasn't there. That's independent of the fence because the north landing, you have the sort of, you have the, say, where I am is, say, the north landing and where you are is the animal compound except instead of you being above, I would be above looking down. And so the, when you're standing on the landing looking, you're looking down directly into the animal compound over, you know, directly into the animal compound. It doesn't matter what the side fence is. And if you look at plaintiffs, even their original complaints or amended complaints except for record 210, the plaintiffs indicate that they got some of their most important video shots from the north ramp landing. That's also true in the ER 193 and 199, the Bulbul and Cuviello declarations where they indicated that they got their footage that went on the news from the north ramp landing. And if you look at the supplemental excerpts of record, the video, if you look at one hour, four minutes, 24 seconds to one hour, four minutes and 45 seconds, it shows the footage that they actually secured from the north ramp landing using their camera. They were able to see pictures of the elephants, pictures of the trainers because they were able to get very close with their lenses. And a final point, which I believe Judge Baya had made in questioning the opposing side, is if they want, they can buy a ticket and go into the animal compound and take whatever pictures they want. Can they take video? Yes. The rule is that no one can take video or pictures in the circus itself, but there's no rule that prevents people from taking cameras or video into the animal compound itself, assuming they have a ticket. And that has not been briefed in this preliminary injunction because they have not raised that. What does the ticket cost to go to the animal compound? It would be whatever the ticket is, the ticket price to get into the circus because the way the animal compound works is about 45 minutes before the main show you have the ability to go into the animal compound. Are you familiar with what your tariff is? I am not. If you're curious, perhaps the counsel for the circus may know, but I don't believe that. I'm looking at the picture on page 10, and just looking at that picture, it would appear that the truck compound is only on two sides of the animal compound and that, therefore, you could have access to the perimeter fence on the other two sides. But we were told that isn't true. Is that right? Well, in terms of the south side is where sort of the entrance to the animal compound. So you have, I think, everyone is sort of coming in through the chute heading that way. So I think they have their access on that side would be 10 feet away from the actual entrance at the edge of the chute to the extent they could look in. But this is showing two. I don't understand this to be the entrance. There's a red line, and then around it there's a green line. And the green line overlaps the red line on two sides of the animal compound. Correct. And on the far left side, I think that the green line is a little bit further out from the red line. But I think as they acknowledge it, it's a lot closer than on the other side. On the picture, it's not. So the picture must be inaccurate, because on the picture, it tracks directly on the red line. That's wrong. Well, I think it's there's a fence for the animal compound, and I think there's a second fence. So there is a 20 feet or so difference. I'm not sure it's 20 feet. I'm not sure that's in the record one way or the other. In terms of the preliminary injunction, and again, this goes unfortunately it goes to sort of the procedural question that you had raised earlier, Judge Berzon, about why are we five years in still in a preliminary injunction. The record, the plaintiffs have not moved forward with depositions. They have not moved forward to set the case for trial. So the case is very undeveloped. Is there a discovery schedule? As far as I know, there has not been any discovery. The case has moved. To my mind, coming in as a fairly new appellate lawyer in this, I've never seen anything like this. No. And it's pretty shocking. Normally, you're fighting to get the appeal on the preliminary injunction decided before the trial. And oftentimes, that's a losing battle. So unfortunately, a lot of the factual questions that you're asking, which are all very good questions, we just don't have the record has not been developed. Is there any reason why you can't move for a trial date and get this thing over with? Well, I believe that that is we are planning to do that in the near future. So the answer is no. We have not done so yet. But it is the plaintiff's. There's often nothing to stop the district court from issuing orders and scheduling orders and moving the case along, setting the discovery cutoff. And I think that the case should move along. And I'm not sure why it hasn't. But I think it's the plaintiff's responsibility in part to move the case along, and they haven't. It has to do with the fact that this is a very intermittent event. I mean, it's only once every 10 days for every 10 years when this happens. Is that right? I think, yes. It happens once a year, usually in August. But I think all the time. But everybody loses interest as soon as it's over. It's sort of what's going on. That may be true. But I think that it's important to have the case decided. I know this Court had denied the interlocutory certification on the partial summary judgment ruling. And I think the case, to the extent, I think the case needs to move along towards finality or else we're going to keep coming here on appeals from what could be the fifth or sixth or seventh preliminary injunction, which doesn't seem to make a lot of sense. All right. Thank you, Your Honor. Thank you. Counsel? I'll just give you just one minute if you want to say anything in rebuttal. That's it. Just a couple quick points. I think counsel was referring to not passing the case along. He omitted to mention that we've already obtained summary judgment of defendant's liability in this case as to one of the cases. The only thing going forward on that case is the damages and the injunctive relief. In our view, once we obtain summary judgment, we expected the case to settle. That hasn't worked. That hasn't worked out. But because of the nature of the case and because of the intervening – the nature of the case, as the Court pointed out, additional cases keep coming along. The liability here has already been decided. With respect to – But not with regard, I think – you can correct me if I'm wrong – the particular areas that we're talking about here. The original case was about this northern north ramp or whatever, and that's where the summary judgment was, right? That's largely right. I mean, the areas in which my client's rights were violated include some of the areas that are still at issue. But the specific injunction and the rights that we are litigating as to this preliminary injunction have not been decided. But in terms of whether the defendant's violated my client's rights and are liable, that's over. With respect to the claim that there's a need for offense, we just want to make it clear that there is a need for offense. And it's a red herring, because all my clients are asking for is for the walkway to allow them access, not that they can't block off the area to the public. And there is no showing anywhere that they need to block off access to these few free speech activists. Yeah, but ordinarily, the whole – if the area is blocked off, then it's not usually. It isn't seen as a public forum, and if the public in general isn't there, then you don't have any special rights to be there. So that's why if – once they block the whole area off to the public, it would seem that you are on weaker ground, not better ground. California law is actually somewhat different, because it affords special rights and protections to people who are engaged in free speech activities. For example, they are immune from trespassing laws that apply to the public in general. And so the rights in California are actually stronger and afford greater protections to people who are trying to engage in these activities. And I think the burden was on them to show why those activities should have been restricted. Finally, I agree with the Court on the friction point. I think the fact that there is friction between these people is the only reason why we're here, and that's when we need to have free speech activities most strongly protected. Okay. Thank you, counsel. Thank you, everyone. Thank you. The matter is submitted now. And thank you all for a really good argument. I'm going to take a break to set up. Yeah, we're just going to – well, we can just – yeah, we'll just wait for them to – I don't know that we can even get off the bench. Thank you.
judges: Paez, Berzon, Bea